

Gary B. Friedman (GF 2597)
Noah Shube (NS 1300)
Tracey Kitzman (TK 5869)
FRIEDMAN & SHUBE
155 Spring Street
New York, New York 10012
(212) 680-5150

*Attorneys For Plaintiffs*
*(Additional Counsel Following Signature Page)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PERFORMANCE LABS, INC., JOSEPH : 
LEPKOWSKI, DDS d/b/a OAK PARK DENTAL : 
STUDIO, ROOKIES, INC. and JASA, INC., : 
on behalf of themselves and all similarly situated : 
persons, : 
 : 
 : 06 Civ. _____
Plaintiffs, : 
 : 
- against - : 
 : 
AMERICAN EXPRESS COMPANY and : 
AMERICAN EXPRESS TRAVEL RELATED : 
SERVICES COMPANY, INC., : **CLASS ACTION**
 : **COMPLAINT**
Defendants. : 
-----------------------------------------------------------x

Plaintiffs Performance Labs, Inc., Oak Park Dental Studio, Rookies, Inc., and JASA, Inc., on behalf of themselves and all others similarly situated, as and for their Class Action Complaint, allege as follows:

**I.**

**INTRODUCTION**

1. This action challenges American Express's rules preventing U.S. merchants from providing consumers with incentives to use forms of payment that are less expensive to the merchant than American Express-branded cards (the "Anti-Steering

Rules.")  In the absence of the Anti-Steering Rules, consumers would have incentives to use payment forms -- such as debit cards, cash, Discover-branded cards and so forth -- that impose lower costs upon the merchant than do American Express-branded charge and credit cards.  If merchants were free to give consumers incentives to use less costly payment products, then American Express would be under pressure to reduce its merchant pricing or lose consumers to cheaper payment forms.  The Anti-Steering Rules, however, insulate American Express from any such price-based competition.  By ensuring that the consumer neither knows nor cares how expensive her payment product is to the merchant, and thus has no incentive to switch to a competitor of American Express, the Anti-Steering Rules serve to entrench American Express's position of monopoly power in the U.S. markets for corporate and/or personal charge card services, among other markets.

2. The Anti-Steering Rules further ensure that merchants seeking to pass along the high merchant discount fees they incur on American Express transactions must raise prices to all consumers, including cash-payers, debit card users and those who would otherwise seek to avoid the high cost of defendants' card processing services.  In the absence of the Anti-Steering Rules, the merchant would be free -- for example -- to impose the discount fee directly upon the Cardholder who chooses to use the expensive American Express payment card.  The price of goods and services would fall because those prices would no longer be marked up to reflect merchant discount fees.

3. In addition to insulating American Express from competition and raising prices for all consumers, the Anti-Steering Rules compel inequitable and anticompetitive subsidies, running from the least affluent U.S. consumers to the most affluent.  Because

merchants must mark up the price of all goods to cover the costs of accepting American Express payment products -- rather than impose the discount fee directly upon American Express Cardmembers or otherwise steer the consumer to a cheaper payment form -- the Anti-Steering Rules effectively compel cash payers and users of other low cost payment forms to subsidize all of the costly perquisites enjoyed by consumers using American Express payment products, including frequent flier miles, rental car insurance, free gifts and even cash-back rewards.

4. Finally, as discussed below, the Anti-Steering Rules simply have no pro-competitive benefits to offset all of their patent and significant anticompetitive effects.

## II.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the defendants may be found or transact business within this District.

## III.

## THE PARTIES

7. Plaintiff Performance Labs, Inc. is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Patterson, New Jersey, where it accepts American Express branded payment cards.

3

8. Plaintiff Joseph Lepkowski, DDS d/b/a Oak Park Dental Studio is a sole proprietorship located in Oak Park, Illinois. Oak Park Dental Studio accepts American Express branded payment cards.

9. Plaintiff JASA, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, where it accepts American Express branded payment cards.

10. Plaintiff Rookies, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, where it accepts American Express branded payment cards.

11. Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

12. Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to American Express Travel Related Services Company, Inc. or the American Express network or the American Express brand.

IV.

## CLASS ACTION ALLEGATIONS

13. Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act.

14. The class is comprised of all merchants that have accepted defendants' payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class"). The Class does not include American Express or its agents, subsidiaries or affiliates.

15. The members of the Class are so numerous that joinder of all members is impracticable.

16. There exist questions of law or fact common to the Class.

17. The claims of the representative plaintiffs are typical of the claims of the Class.

18. Plaintiff and his counsel will fairly and adequately represent the interests of the Class. The named plaintiffs have retained counsel that is competent and experienced in federal antitrust and class action litigation.

19. American Express has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

20. This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

## V.

## FACTUAL BACKGROUND

### Industry Background

21. When a consumer presents an American Express-branded card to a retailer for payment, the merchant swipes the card and transmits a record of the transaction to

American Express. American Express then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that American Express charges retailers. For a typical retailer in the travel and entertainment industry, for example, that discount fee is well over 3% of the total transaction. At 3%, if the consumer presents an Amex card to make a $100 purchase, the merchant will receive $97 from American Express, and American Express will bill its cardholder for $100.

22. Other payment products are far less costly to the merchant. Debit cards, Discover-branded credit cards and even most Visa and MasterCard products carry much lower discount fees than American Express. And of course, cash and checks are likewise far less costly to the merchant. As a result, if merchants were able to steer transactions to payment forms other than Amex, they would realize significant savings. In a competitive retail marketplace, those savings will be passed along to consumers in the form of lower prices.

**The Anti-Steering Rules**

23. There are many ways that a retailer might steer transactions to a less costly and more efficient payment card, including:

- offering a discount for using a cheaper payment product, such as Discover Card, debit cards, checks or cash;

- verbally asking customers if they mind using the cheaper payment product;

- posting signage indicating a preference for the cheaper payment product;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of American Express;

6

- imposing a small surcharge for using American Express cards (provided the retailer is located in one of the 41 states where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

24. American Express's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these efficiency-enhancing practices.

25. The Anti-Steering Rules are set forth in American Express's standard form Card Acceptance Agreement and are available on the "Merchants" section of American Express's website. A typical iteration, drawn from the May 2003 Terms And Conditions For American Express® Card Acceptance Agreement, provides:

> When a Cardmember makes or requests to make a purchase or payment with the Card, you agree not to: 1) try in any way to persuade the Cardmember to use any other payment method (e.g. payment by check); 2) offer to extend payment services to the Cardmember for that transaction through any Other Payment Product [defined to include any "charge, credit, debit. . . and/or other payment card"]; 3) criticize or mischaracterize the Card or any service or program offered in connection with the Card; or 4) impose any restrictions or conditions on the use or acceptance of the Card that are not imposed equally on the use or acceptance of all Other Payment Products.

26. The Card Acceptance Agreement further provides the merchant may not engage in any practices or programs that "indicate or imply that you prefer Other Payment Products;" nor may the merchant "promote the use of any Other Payment Products more actively than you promote the use of the [American Express] Card." (Id. at 6).

27. The intended and actual result of American Express's Anti-Steering Rules is near-total insulation from price-based competition in the payment card services

7

markets. A competitor network -- such as Discover Financial Services or a new market entrant -- may offer to provide comparable services to retailers at a fraction of the price charged by American Express. Such a pro-competitive strategy, however, will not allow this would-be competitor to gain any market share from American Express. The reason that the competitor network cannot gain market share by offering the same services at lower prices is because of the Anti-Steering Rules. The Anti-Steering Rules ensure that the consumer will have no incentive to use the less expensive and more efficient payment medium. And it is the consumer who decides which payment option to use. The Anti-Steering Rules thus render American Express largely impervious to price-based competition.

28. In the absence of American Express's Anti-Steering Rules, moreover, the fees that American Express is able to charge merchants for processing transactions on the American Express payment card network would be greatly diminished. Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

29. Further, in the 42 states where surcharging is permitted, the abolition of the Anti-Steering Rules would enable merchants to impose directly upon the Amex Cardmember the cost of all the frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are financed out of merchant discount fees. Presently, the benefits enjoyed by American Express Cardmembers are subsidized by all consumers, as well as merchants. If the merchant were free to pass along the discount fee *directly* to the Amex card user via a discrete surcharge, the cardholder could decide for herself if she wants to incur the costs necessary to fund these perks. Customers who choose to use an expensive payment medium would pay for the privilege. While an

affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

**Market Definition and Market Power**

30.     General purpose charge card services form the product dimension of a relevant market, the geographic dimension of which is the United States (the "Charge Card Services Market"). American Express possesses monopoly power in the Charge Card Services Market.

31.     Corporate card services form the product dimension of another relevant market (or submarket), the geographic dimension of which is the United States (the "Corporate Card Services Market"). American Express possesses monopoly power in the Corporate Card Services Market.

**Nature of the Injuries**

32.     The Anti-Steering Rules injure merchants because they insulate American Express from price-based network competition, thereby enabling American Express to extract supra-competitive discount fees. The Anti-Steering Rules only insulate American Express from competitive pressures in merchant pricing because the Rules are imposed across the board, on all U.S. merchants. For any particular merchant, then, this harm is not inflicted merely by American Express prohibiting that merchant from steering. Instead, the particular merchant is harmed because American Express imposes the Anti-Steering Rules upon each new and existing merchant that joins or participates in the

9

American Express network, and because American Express enforces its Anti-Steering Rules.

33. On a going-forward basis, the Anti-Steering Rules will further inflict new and accumulating injury on U.S. merchants because the similar rules of other networks have either been rescinded or will be rescinded as a result of ongoing litigation, creating a situation in which American Express's maintenance of Anti-Steering Rules would have profoundly (and qualitatively new) anti-competitive effects upon U.S. merchants. In particular, Discover Financial Services announced in early 2006 that it is rescinding its "no-surcharge rule" and any prohibitions upon merchant steering. And in early 2005, the no-surcharge rules and anti-steering rules of the Visa and MasterCard associations were challenged in merchant class actions, which have recently been consolidated in MDL 1720 in the Eastern District of New York. If merchants are free to provide all customers with incentives to use lower cost payment forms except for American Express Cardmembers, then the nature and scope of the injury inflicted upon merchants by the Anti-Steering Rules will be greatly magnified and altered.

34. Merchants will continue to suffer irreparable injury as a result of the Anti-Steering Rules until three conditions are satisfied:

(i) The Anti-Steering Rules must be abolished;

(ii) Merchants must be fully and fairly informed of the abolition of the Anti-Steering Rules, and of the parameters of permissible surcharging; and

(iii) Consumers must be fully and fairly informed of the nature of, and reasons for, the payment card surcharges they may encounter.

## FIRST CLAIM FOR RELIEF

*For Intentional Monopolization In
Violation of Section Two of the Sherman Act, 15 U.S.C. §2*

35. Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

36. Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

37. American Express has and exercises monopoly power in the payment card services markets set forth above.

38. The Anti-Steering Rules further and protect American Express's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

39. The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

40. American Express's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

41. As a direct and foreseeable result of American Express's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, plaintiffs have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

*For Imposition Of Unreasonable Restraints Of Trade*
*In Violation of Section 1 of The Sherman Act, 15 U.S.C. §1*

42.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

43.     Section One of the Sherman Act prohibits contracts in restraint of trade. More specifically, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

44.     American Express has and exercises market power in the relevant markets identified above.

45.     The Anti-Steering Rules, imposed upon merchant plaintiffs by American Express, represent an unlawful contract in restraint of trade. Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card services.

46.     The Anti-Steering Rules are anticompetitive. Among the anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of defendants' high cost payment media, the entrenchment of American Express's market position and the insulation of American Express against any competitive threat from a rival offering cheaper or more efficient payment card services.

47.     There exists no procompetitive justification for the Anti-Steering Rules.

48.     As a direct and foreseeable result of defendants' willful imposition of the Anti-Steering Rules, plaintiffs have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

12

WHEREFORE, plaintiffs respectfully seek an Order:

A. Directing that the instant action may be maintained as a Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

B. Declaring that the American Express Anti-Steering Rules are illegal and directing their rescission;

C. Directing the defendants to cooperate with the plaintiffs in the establishment, funding and execution of a campaign that adequately informs merchants and consumers of the rescission of the Anti-Steering Rules;

D. Awarding attorneys' fees and costs of suit; and

E. Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
April 18, 2006

                                        FRIEDMAN & SHUBE

                                        Gary B. Friedman (GF 2597)
                                        Noah Shube (NS 1300)
                                        Tracey Kitzman (TK 5869)
                                        155 Spring Street
                                        New York, New York 10012
                                        (212) 680-5150

*Additional Plaintiffs' Counsel on following pages*

LAW OFFICES OF ROBERT W. COHEN
1875 Century Park, Suite 1700
Los Angeles, CA 90067
(310) 282-7586

*Additional Plaintiffs' Counsel*

Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
REINHARDT WENDORF & BLANCHFIELD
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
Christopher W. Hellmich, Esq.
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

Eric Belfi, Esq.
Brian Brooks, Esq.
MURRAY FRANK & SAILER
275 Madison Avenue, 8th Floor
New York, NY 10016
(212) 682-1818

Blaine H. Bortnick Esq.
Christine Palmieri, Esq.
LIDDLE & ROBINSON, L.L.P.
685 Third Avenue
New York, New York 10022
(212) 687-8500

Robert W. Cohen, Esq.
LAW OFFICES OF ROBERT W. COHEN
1875 Century Park, Suite 1700
Los Angeles, CA 90067
(310) 282-7586

David Markun, Esq.
Edward Zusman, Esq.
Kevin Eng, Esq.
MARKUN ZUSMAN & COMPTON LLP
601 Montgomery Street, Suite 601
San Francisco, CA 94111
(415) 438-4515

Susan G. Kupfer, Esq.
GLANCY BINKOW & GOLDBERG LLP

455 Market Street, Suite 1810
San Francisco, CA 94105

Robert C. Schubert, Esq.
Willem F. Jonckheer, Esq.
Aaron Darsky, Esq.
SCHUBERT & REED, LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA 94111
(415) 788-4220

Curtis V. Trinko, Esq.
LAW OFFICES OF CURTIS V. TRINKO LLP
16 West 46th Street, 7th Floor
New York, NY 10036
(212) 490-9550

Paul C. Whalen, Esq.
Joseph S. Tusa, Esq.
WHALEN & TUSA, PC
275 Madison Avenue, Suite 801
New York, NY 10016
(212) 682-1818

Roy A. Katriel, Esq.
THE KATRIEL LAW FIRM, PLLC
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 625-4342