Gary B. Friedman (GF 2597)
Tracey Kitzman (TK 5869)
Dean M. Solomon (DS 3699)
**FRIEDMAN LAW GROUP LLP**
270 Lafayette Street, 14th Floor
New York, New York 10012
(212) 680-5150

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
Lisa Hayes, Esq.
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Christopher W. Hellmich, Esq.
Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Co-Lead Counsel For Representative Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re: AMERICAN EXPRESS ANTI-STEERING    :   Master File No.
RULES ANTITRUST LITIGATION                :   06 CV 2974 (WHP)
                                          :
                                          :   ECF
                                          :
This Document Relates To:                 :   **FIRST CONSOLIDATED**
ALL ACTIONS                               :   **CLASS ACTION**
                                          :   **COMPLAINT**

-----------------------------------------------------------x

Representative Plaintiffs Lopez-Dejonge, Inc.; Parlor Corporation; JASA, Inc.; Italian Colors Restaurant; Cohen Rese Gallery, Inc.; Bar Hama LLC; and Animal Land, Inc. (collectively, the "Representative Plaintiffs"), on behalf of themselves and all others similarly situated, as and for their First Consolidated Class Action Complaint against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex"), hereby allege as follows:

# I.
# **INTRODUCTION**

1.  This action challenges Amex's rules preventing U.S. merchants from providing consumers with incentives to use forms of payment that are less expensive to the merchant than Amex-branded payment cards (the "Anti-Steering Rules.")  In the absence of the Anti-Steering Rules, consumers would have incentives to use payment forms — such as debit cards, cash, checks, Visa-, MasterCard- and Discover-branded payment cards, and so forth — that impose lower costs upon the merchant than do Amex-branded payment cards.  If merchants were free to give consumers incentives to use less costly payment products, then Amex would be under pressure to reduce its merchant pricing or lose consumers to cheaper payment forms. The Anti-Steering Rules, however, insulate Amex from any such price-based competition.  By ensuring that the consumer neither knows nor cares how expensive her payment product is to the merchant, and thus has no incentive to switch to an alternative payment form, or a competitor of Amex, the Anti-Steering Rules serve to entrench Amex's position of monopoly power in the U.S. markets for corporate, small business, and personal charge card services, among other markets.

2.  The Anti-Steering Rules further ensure that certain merchants seeking to pass along the high merchant discount fees they incur on Amex payment card services must raise their prices to all consumers, including cash-payers, debit card users, and those who would otherwise seek to avoid the high cost of such services.  In the absence of the Anti-Steering Rules, the merchant would be free — for example — to impose the merchant discount fee directly upon the Cardholder who chooses to use the more expensive Amex-branded payment card.  The price of goods and services would fall

because those prices would no longer be marked up to reflect artificially inflated merchant discount fees.

3. In addition to insulating Amex from competition and raising prices for all consumers, the Anti-Steering Rules compel inequitable and anticompetitive subsidies, running from the least affluent U.S. consumers to the most affluent. Because merchants must mark up the price of all goods to cover the costs of accepting Amex-branded payment products — rather than impose the discount fee directly upon Amex Cardmembers or otherwise steer the Cardmember to a cheaper payment form — the Anti-Steering Rules effectively compel cash payers and users of other low cost payment forms to subsidize all of the costly perquisites enjoyed by Cardmembers using Amex-branded payment card products, including frequent flier miles, rental car insurance, free gifts and even cash-back rewards.

4. Finally, as discussed below, the Anti-Steering Rules simply have no pro-competitive benefits to offset all of their patent and significant anticompetitive effects.

## II.
## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that, pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the Defendants may be found or transact business within this District.

## III.

## THE PARTIES

7.     Representative Plaintiff Lopez-Dejonge, Inc. is a corporation organized under the laws of the State of Alabama, with its principal place of business in Birmingham, Alabama.  Representative Plaintiff Lopez-Dejonge, Inc. owns and operates Rojo, where it began accepting Amex cards in or about June 2002, and continues to accept such cards to this day.

8.     Representative Plaintiff Parlor Corporation is a corporation organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.  Representative Plaintiff Parlor Corporation owns and operates Parlor, where it began accepting Amex cards in or about August 2005, and continues to accept such cards to this day.

9.     Representative Plaintiff JASA, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana.  Representative Plaintiff JASA, Inc. owns and operates The Harbor, where it began accepting Amex cards in or about May 2000, and continues to accept such cards to this day.

10.     Representative Plaintiff Italian Colors Restaurant is a California partnership with its principal place of business in Oakland, California.  Representative Plaintiff Italian Colors Restaurant owns and operates Italian Colors Restaurant, where it began accepting Amex cards in or about the early 1990s, and continues to accept such cards to this day.

11.     Representative Plaintiff Cohen Rese Gallery, Inc. is a California corporation with its principal place of business in San Francisco, California.

Representative Plaintiff Cohen Rese Gallery, Inc. owns and operates Cohen Rese Gallery, where it began accepting Amex cards in or about 2001, and continues to accept such cards to this day.

12. Representative Plaintiff Bar Hama LLC is a California limited liability company with its principal place of business in Los Angeles, California. Representative Plaintiff Bar Hama LLC owns and operates Bar-Hayama, where it began accepting Amex cards in or about 2007, and continues to accept such cards to this day.

13. Representative Plaintiff Animal Land, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia. Representative Plaintiff Animal Land, Inc. owns and operates Animal Land Pet Movers, where it began accepting Amex cards in or about 2000, and continues to accept such cards to this day.

14. Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

15. Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

## IV.
## **CLASS ACTION ALLEGATIONS**

16. Representative Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and for money damages.

17. The class is comprised of all merchants that have accepted Amex-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class"). The Class does not include Amex or its agents, subsidiaries or affiliates.

18. The members of the Class are so numerous that joinder of all members is impracticable.

19. Questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

20. The claims of the Representative Plaintiffs are typical of the claims of the Class.

21. Representative Plaintiffs and their counsel will fairly and adequately represent the interests of the Class. Representative Plaintiffs have retained counsel who is competent and experienced in federal antitrust and class action litigation.

22. Amex has acted and continues to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

23. This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

## V.
## FACTUAL BACKGROUND

**Industry Background**

24.   When a consumer presents an Amex-branded payment card to a retailer for payment, the merchant swipes the card and transmits a record of the transaction to Amex. Amex then sends to the retailer's bank account an amount of money that is, generally speaking, equal to the transaction amount minus the "merchant discount fee" that Amex charges retailers. For a typical retailer in the travel and entertainment industry, for example, that discount fee is well over 3% of the total transaction. At 3%, if a Cardmember presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its Cardmember for $100.

25.   Other payment products are far less costly to the merchant. Debit cards, Discover-branded credit cards, and even most Visa- and MasterCard-branded payment cards carry much lower discount fees than Amex. And of course, cash and checks are likewise far less costly to the merchant. As a result, if merchants were able to steer transactions to payment forms other than Amex, they would realize significant savings. In a competitive retail marketplace, those savings will be passed along to all consumers in the form of lower prices for all.

**The Anti-Steering Rules**

26.   There are many ways that a retailer might steer transactions to a less costly and more efficient payment card, including:

- offering a discount for using a cheaper form of payment, such as Discover-, Visa-, and MasterCard-branded credit cards, debit cards, checks or cash;

- verbally asking customers if they mind using the cheaper payment form;

7

- posting signage indicating a preference for the cheaper payment form;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

- imposing a small surcharge for using Amex-branded payment cards (provided the retailer is located in one of the 41 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

27. Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these efficiency-enhancing practices.

28. The Anti-Steering Rules are set forth in Amex's standard form Card Acceptance Agreement and are available on the "Merchants" section of Amex's website. A typical iteration of the Terms And Conditions For American Express® Card Acceptance Agreement,, drawn from Amex's website on January 30, 2007, provides:

> When a customer asks what payment methods are accepted, you will mention the Card. You will honour the Card, and will not attempt to: (1) dissuade the Cardmember from using the Card; (2) criticize or mischaracterize the Card or any services or programs offered in connection with the Card; (3) persuade the Cardmember to use any other credit, charge, debit or smart card or other card, account access device or service; or (4) impose any restrictions or conditions on the use or acceptance of the Card that are not imposed equally on the use or acceptance of other cards.

29. The Card Acceptance Agreement further provides the merchant may not engage in any practices or programs that "indicate or imply that you prefer Other Payment Products;" nor may the merchant "promote the use of any Other Payment Products more actively than you promote the use of the [Amex] Card."

30. The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price-based competition in the payment card services markets. A

competitor network — such as Discover Financial Services or a new market entrant — may offer to provide comparable services to retailers at a fraction of the price charged by Amex. Such a pro-competitive strategy, however, will not allow this would-be competitor to gain any market share from Amex. The reason that the competitor network cannot gain market share by offering the same services at lower prices is because of the Anti-Steering Rules. The Anti-Steering Rules create a vertical restraint that ensures that the consumer will have no incentive to use the less expensive and more efficient payment medium. And it is the consumer who decides which payment option to use. The Anti-Steering Rules thus render Amex largely impervious to price-based competition.

31.   In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex is able to charge merchants for processing transactions on the Amex payment card network would be greatly diminished. Merchants would incur lower fees and pass along the benefits to consumers in the form of lower prices.

32.   Further, in the 41 states and the District of Columbia where surcharging is permitted, the abolition of the Anti-Steering Rules would enable merchants to impose directly upon the Amex Cardmember the cost of all the frequent flier miles, Membership Rewards Points®, travel insurance and other perquisites that are financed out of merchant discount fees. Presently, the benefits enjoyed by Amex Cardmembers are subsidized by all consumers, as well as merchants. If the merchant were free to pass along the discount fee *directly* to the Amex card user via a discrete surcharge, the Cardmember could decide for herself if she wants to incur the costs necessary to fund these perks. Customers who choose to use an expensive payment medium would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra

two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

**Market Definition and Market Power**

33. The product dimension of the relevant markets at issue in this case are no broader than:

    (a)    corporate card services, of all brands;

    (b)    small business card services, of all brands; and

    (c)    personal charge card services, of all brands.

34. In fact, there exist relevant product markets that consist solely of:

    (a)    Amex-branded corporate card services;

    (b)    Amex-branded small business card services; and

    (c)    Amex-branded personal charge card services.

35. The geographic dimension of each of the above-referenced relevant product markets is the United States.

36. Amex has market power or monopoly power in each of the relevant product markets referenced above.

37. In the alternative, even if the relevant market were regarded as being comprised of all general purpose charge and credit card services (which would be erroneous), Amex still possesses market power for purposes of the instant claims challenging its Anti-Steering Rules for the reasons set forth in a Report of the Reserve Bank of Australia, issued shortly before Amex's agreement to rescind its no-surcharge rules in Australia:

> By itself, the finding that credit and charge cards issued on the American Express or [other] networks comprise small

shares of total cards or support small shares of total card-based transactions does not prove that these systems lack market power in the sense relevant for the analysis of no-surcharge rules. For example, if business travelers using American Express corporate cards were required to use those cards when traveling for business purposes in order to qualify for reimbursement by their employers, then this requirement might generate market power for American Express with respect to merchants, particularly merchants catering to business travelers, such as airlines, hotels, and restaurants. Visa also argues that American Express cardholder rewards programs could have similar effects for other consumers.

**Nature of the Injuries**

38. The Anti-Steering Rules injure merchants because they insulate Amex from price-based network competition, thereby enabling Amex to extract supra-competitive discount fees. The Anti-Steering Rules only insulate Amex from competitive pressures in merchant pricing because the Rules are imposed across the board, on all U.S. merchants. For any particular merchant, then, this harm is not inflicted merely by Amex prohibiting that merchant from steering. Instead, the particular merchant is harmed because Amex imposes the Anti-Steering Rules upon each new and existing merchant that joins or participates in the Amex network, and because Amex enforces its Anti-Steering Rules.

39. On a going-forward basis, the Anti-Steering Rules will further inflict new and accumulating injury on U.S. merchants because the similar rules of other networks have either been rescinded or will be rescinded as a result of ongoing litigation, creating a situation in which Amex's maintenance of Anti-Steering Rules would have profoundly (and qualitatively new) anti-competitive effects upon U.S. merchants. In particular, Discover Financial Services announced in early 2006 that it is rescinding its "no-

surcharge rule" and any prohibitions upon merchant steering. And in early 2005, the no-surcharge rules and anti-steering rules of the Visa and MasterCard associations were challenged in merchant class actions, which have recently been consolidated in MDL 1720 in the Eastern District of New York. If merchants are free to provide all customers with incentives to use lower cost payment forms except for Amex Cardmembers, then the nature and scope of the injury inflicted upon merchants by the Anti-Steering Rules will be greatly magnified and altered.

40. Merchants will continue to suffer irreparable injury as a result of the Anti-Steering Rules until three conditions are satisfied:

(i) The Anti-Steering Rules are abolished;

(ii) Merchants are fully and fairly informed of the abolition of the Anti-Steering Rules, and of the parameters of permissible surcharging; and

(iii) Consumers are fully and fairly informed of the nature of, and reasons for, the payment card surcharges they may encounter.

41. In addition, as a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, merchants have suffered damages. But for the Anti-Steering Rules, Amex would be compelled to, and would in fact, charge merchants significantly lower discount fees than it presently does. The difference between Defendants' merchant fees and the fees that would apply but for the Anti-Steering Rules represents damages to the merchant Class.

## FIRST CLAIM FOR RELIEF

*For Willful Monopoly Maintenance In*
*Violation Of Section 2 Of The Sherman Act, 15 U.S.C. §2*

42. Representative Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

43. Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

44. Amex has and exercises monopoly power in the payment card services markets set forth above.

45. The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

46. The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

47. Amex's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

48. As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Representative Plaintiffs have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

49. As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the

Anti-Steering Rules, Representative Plaintiffs have suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

*For Imposition Of Unreasonable Restraints Of Trade
In Violation Of Section 1 Of The Sherman Act, 15 U.S.C. §1*

50. Representative Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

51. Section One of the Sherman Act prohibits contracts in restraint of trade. More specifically, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

52. Amex has and exercises market power in the relevant markets identified above.

53. The Anti-Steering Rules, imposed upon merchant Representative Plaintiffs by Amex, represent an unlawful contract in restraint of trade. Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for payment card services.

54. The Anti-Steering Rules are anticompetitive. Among the anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

55. There exists no procompetitive justification for the Anti-Steering Rules.

14

56. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Representative Plaintiffs have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

57. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Representative Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE, Representative Plaintiffs respectfully seek an Order:

A. Directing that the instant action may be maintained as a Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

B. Declaring that the Amex Anti-Steering Rules are illegal and directing their rescission;

C. Directing Defendants to cooperate with Representative Plaintiffs in the establishment, funding and execution of a campaign that adequately informs merchants and consumers of the rescission of the Anti-Steering Rules;

D. Awarding damages in an amount to be determined at trial and then trebled;

E. Awarding attorneys' fees and costs of suit; and

F. Granting such other and further relief as this Court may deem just and proper.

JURY DEMAND

Representative Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: New York, New York
       March 12, 2009

                                              **FRIEDMAN LAW GROUP LLP**

                                              Gary B. Friedman (GF 2597)
                                              Tracey Kitzman (TK 5869)
                                              Dean M. Solomon (DS 3699)
                                              270 Lafayette Street, 14th Floor
                                              New York, New York 10012
                                              Tel:   (212) 680-5150
                                              Fax:  (646) 277-1151

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
Lisa Hayes, Esq.
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Christopher W. Hellmich, Esq.
Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

*Co-Lead Counsel For Representative Plaintiffs*